# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| WAYNE MANUFACTURING, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No. 1:21-cv-00290-HAB |
| | ) | |
| COLD HEADED FASTENERS | ) | |
| AND ASSEMBLIES INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff, Wayne Manufacturing, LLC ("Wayne"), contracted with Defendant, Cold Headed Fasteners and Assemblies Inc. ("Cold Headed"), to purchase bolts which were to later be incorporated into vehicle assemblies. Wayne sued Cold Headed alleging that the bolts Cold Headed supplied were defective and asserted claims for breach of contract, breach of express warranty, breach of implied warranty of merchantability, and breach of the implied warranty of fitness for a particular purpose. (ECF No. 3). Cold Headed timely removed the case under diversity of citizenship and asserted its own counterclaims for breach of contract and, in the alternative, unjust enrichment. (ECF No. 16).

Presently before the Court are the parties' cross-motions for summary judgment.[1] (ECF Nos. 59, 64). Those motions have been fully briefed, supplemented (ECF Nos. 59-63, 68-72, 74-

---

[1] Plaintiff also filed a Motion to Strike (ECF No. 73). Because the Court can distinguish which exhibits, affidavits, and statements may properly be considered when deciding whether summary judgment is appropriate, the Court denies the motion. The Court has noted the Plaintiff's objections and has considered the objections when they arose in the Court's summary judgment analysis. The Court also notes that, in reaching its summary judgment conclusions, it did not rely on any of the materials that formed the basis for Plaintiff's objection.

77), and are ripe for ruling.[2] For the reasons below, Wayne's Motion for Summary Judgment will be GRANTED. All remaining motions will be DENIED.

## I.     Factual Background

Wayne is an Indiana limited liability company that manufactures and sells automotive components and assemblies. (ECF No. 72, ¶ 1). Sometime before the parties' dispute, Wayne was awarded a contract with Dana Holding Corporation ("Dana") to supply retainer assemblies which would be incorporated into axles produced by Dana. (ECF No. 72, ¶ 8). Dana is Wayne's largest customer. (*Id.*)

Dana's contract required Wayne to use specially designed bolts in their retainer assemblies. (ECF No. 72, ¶ 9). To satisfy this obligation, Wayne contacted Cold Headed about supplying the required bolts because there was some level of familiarity between Dana and Cold Headed. (ECF No. 72, ¶ 11). Dana designed the bolts, prepared the drawings and specification for the bolts' production, and provided those specifications to Wayne. (ECF No. 72, ¶ 17-18). Wayne provided that information to Cold Headed—including Dana's drawings. (ECF No. 72, ¶ 17). Cold Headed knew that the bolts would end up in parts produced by Dana because the drawings showed that they were a Dana print.[3] (ECF No. 72, ¶ 20). The drawings for the production version of the bolts were included in the Production Parts Approval Process ("PPAP") documents completed by Cold Headed and submitted to Wayne for approval. The PPAP contained certain requirements for

---

[2] The Court notes that Cold Headed did not move for summary judgment on its breach of contract and unjust enrichment counterclaims against Wayne. (ECF No. 16).

[3] In Cold Headed's Response to Wayne's Statement of Material Facts, Cold Headed claims to dispute this assertion. However, it is clear from their response that Cold Headed's president knew "the bolts were going to be used for Dana" because Cold Headed was provided "a Dana print." (ECF No. 72, ¶ 20).

hardness and heat treating of the bolts.[4] (ECF No. 72, ¶ 21). Along with these documents, Cold Headed provided sample bolts which complied with the specifications required by Dana. (*Id.* at ¶ 16). Essentially, the relationship is as follows: Cold Headed manufactured the bolts, Wayne implemented the bolts into retainer assemblies, Dana incorporated the retainer assemblies into their axles, and Dana's customers would place the finished axles into vehicles.

The PPAP documents—which the parties acknowledge as a mutually agreed upon contract—included a Potential Failure Mode Effects Analysis ("PFMEA"). (ECF No. 72, ¶ 24). The PFMEA's purpose is to describe what the impact would be if Cold Headed were to fail to meet the hardness specifications on the Dana drawings. (*Id.* at ¶ 26). Under the PFMEA, the parties agreed the bolts would have a "severity level of 6 and an occurrence level of 2." (*Id.* at ¶ 27). When the bolts or a shipment of bolts fails to meet that criterion, "[h]ardness does not meet customer spec[ifications]." (*Id.*).

A heat treat severity level assigned to bolts depends on whether a faulty bolt would result in the loss of primary or secondary vehicle function. (ECF No. 63 at 6). A heat treat severity level of 6 contemplates loss of only a secondary vehicle function. (*Id.* at 7). Loss of secondary vehicle function essentially means that the consumer would have to "park the car for a period of time while it's repaired." (*Id.*). An occurrence level, on the other hand, refers to how frequently the event of a bolt not being hard enough is expected to occur. (ECF No. 72, ¶ 30). An occurrence level of 2 expects an error rate between 1 in 100,000 to 1 in 100,000,000. (ECF Nos. 62-9, ¶ 5; 62-6 at 67:19-

---

[4] Specifically, the drawing contained specifications for compliance with Metric Class 10.9 standards and hardening to be accomplished by heat treating the bolt to a surface hardness of 76-80 as measured by the 15-N Rockwell Superficial Hardness Scale. (ECF No. 72, ¶ 21).

68:18; 72, ¶ 73). The parties agree that all the bolts Cold Headed manufactured should be "made to [this] standard." (ECF No. 72, ¶ 33).

After nailing down these specifications, Wayne would issue purchase orders[5] for production quantities of bolts, and Cold Headed would accept those orders and supply the bolts to Wayne. (*Id.* at ¶ 34). Wayne made its first purchase from Cold Headed in fall of 2016 using this process. (*Id.* at ¶ 37). Through October 2020, Wayne ordered and Cold Headed supplied production quantities of bolts via updated purchase orders. (ECF No. 16, ¶ 17). With every shipment to Wayne, Cold Headed issued a certificate of conformance stating that the bolts complied with the specifications listed in the drawings.[6] (ECF No. 72, ¶ 39-40).

From 2017 to the beginning of 2020, the relationship between the parties was unremarkable. But in the middle of 2020, Cold Headed began failing to deliver the bolts on time. (*Id.* at ¶ 43). Soon after, the wheels fell off their arrangement.

In October 2020, Wayne informed Cold Headed that Dana had "seen some [bolts] missing the heat treat process." (*Id.* at ¶ 47). Dana followed up with a formal notification of noncompliance

---

[5] The parties agree that the purchase orders formed a binding contract between Wayne and Cold Headed. (ECF No. 72, ¶ 36). They also agree that "Wayne relied on Cold Headed to ship bolts that met the agreed-upon specifications." (*Id.*).

[6] As addressed in Wayne's Motion to Strike (ECF No. 73), Cold Headed was required to file a response to Wayne's Statement of Material Fact that includes "a citation to evidence supporting each dispute of fact." *See* N.D. Ind. L.R. 56(b)(2)(C). In response to the assertion that the certificate of conformance stated that the bolts complied with the specifications on the print, Cold Headed merely states, "Cold Headed disputes this" without citation or explanation. (ECF No. 72, ¶ 40). Where Cold Headed fails to support its disputed facts as required by the local rules, the Court will consider such facts admitted. *See Parra v. Neal*, 614 F.3d 635, 636 (7th Cir. 2010); *Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 393 (7th Cir. 2009) ("In accordance with a local rule, the district court justifiably deemed the factual assertions in BP's Rule 56.1(a) Statement in support of its motion for summary judgment admitted because Rao did not respond to the statement."); *Jankovich v. Exelon Corp.*, 2003 WL 260714, at *5 (N.D. Ill. 2003) (explaining that "evasive and unsupported" denials under a similar local rule are deemed admitted for purposes of summary judgment; *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (noting that the Seventh Circuit has routinely sustained "the entry of summary judgment when the non-movant has failed to submit a factual statement in the form called for by the pertinent rule and thereby conceded the movant's version of the facts"); *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1017 (7th Cir. 2016) ("How strictly to apply a local rule is left to the district court's sound discretion.").

to Wayne explaining that some assemblies contained bolts "out of specification" and failed to achieve minimum tolerance under the Rockwell hardness test.[7] (*Id.* at ¶ 50). Wayne provided this documentation to Cold Headed along with its own formal notice of noncompliance. (*Id.* at ¶ 51-52). Similarly, Wayne's formal notice to Cold Headed explained that the bolts were non-conforming because they failed the Rockwell hardness test. (*Id.* at ¶ 53).

Then the investigations came. A Corrective Action Report—prepared by Cold Headed and created in response to the issue with the bolts—states that testing showed that some bolts were not heat treated (commonly referred to as "soft bolts"). (*Id.* at ¶ 55). Thus, the bolts were soft and registered a 0 on the Rockwell hardness scale while the agreed-upon specifications required a score of 76-80. (*Id.* at ¶ 21). The Corrective Action Report identified a particular batch of bolts—Batch 2C—which was likely suspect. (*Id.* at ¶ 56). Batch 2C contained only Cold Headed bolts. (*Id.* at ¶ 58). Upon this discovery, Dana and its customer identified thousands of vehicles in which the soft bolts may have been incorporated along with additional potentially defective retainer assemblies not yet placed into vehicles. (*Id.* at ¶ 59). The existence of the soft bolts required Dana's customer to place a yard hold[8] on such vehicles for inspection and repair. The costs naturally trickled down to Dana.

Once Wayne received the potentially defective bolts and retainer assemblies back from Dana, it undertook its own investigation using a Rockwell tester and IBG eddy current machine.[9] (*Id.* at ¶ 61-62). The Rockwell testing revealed that out of 14,533 Cold Headed bolts tested, 285

---

[7] The Rockwell hardness test is used to test the hardness of metals by indenting the objects and measuring the depth of the indentation.

[8] A "yard hold" is an automotive industry term for when a manufacturer has to place a hold on manufactured vehicles for inspection before they can resume shipment. (ECF No. 63 at 8).

[9] Eddy current machines are used to identify surface and subsurface flaws in conductive materials using electromagnetic testing.

were soft. (*Id.* at ¶ 64). The IBG eddy current machine tested 13,600 more bolts of which 149 were determined soft. (*Id.* at ¶ 65). Wayne's testing did not end there. Wayne identified 23,912 completed retainer assemblies that contained at least one Cold Headed bolt that did not meet the hardness requirements. (*Id.* at ¶ 66).

Cold Headed offered to cure this non-conformity (ECF No. 74, ¶ 90), but the problem had gone too far. Indeed, after the extent of the issue was revealed, Dana informed Wayne that it would no longer accept retainer assemblies that incorporated Cold Headed bolts. (ECF No. 72, ¶ 69). Wayne relayed that information to Cold Headed and no more bolts were shipped after October 12, 2020. (*Id.* at ¶ 70-71). From 2016 to 2020, Cold Headed supplied 9,032,496 bolts to Wayne. (*Id.* at ¶ 72). Of those approximately 9 million bolts, Wayne's testing of Batch 2C identified 434 individual soft bolts as well as at least 23,912 additional soft bolts that had already been incorporated into Wayne's retainer assemblies. (*Id.* at ¶ 74).

Of course, Dana wished to be compensated for the costs they incurred from Wayne's use of Cold Headed's soft bolts. Dana turned to Wayne. Wayne feared that their exposure could exceed several million dollars, so they jumped at the chance to settle Dana's claim for $243,000.[10] Wayne paid Dana $243,000 to release it from all claims relating to the soft bolts. (*Id.* at ¶ 83).

Wayne now seeks its own compensation from Cold Headed because of the non-conforming bolts. On top of its settlement with Dana, Wayne claims to have incurred its own costs for testing, sorting, and scrapping Cold Headed bolts amounting to $60,453.76. (*Id.* at ¶ 84). Yet Wayne still had 6 unpaid invoices for Cold Headed totaling $49,059.65. (*Id.* at ¶ 85). In response, not only did

---

[10] The $243,000 figure represents $174,107.45 in charges from Dana's customer and $68,892.55 in charges incurred by Dana itself. (ECF No. 62-25).

Wayne inform Cold Headed that they can pick up the unused bolts from their storage facility, but Wayne sought to charge Cold Headed $254,394.20.[11] (*Id.* at ¶ 86, 89). Cold Headed refused.

Wayne's Motion for Summary Judgment posits that Cold Headed breached the PPAP by providing soft bolts in excess of the occurrence level of 2. Wayne also claims that Cold Headed created express warranties by issuing certificates of conformance with each shipment, including Dana's drawings and specifications in the PPAP, and providing samples of bolts during the negotiation process. Wayne believes Cold Headed breached these promises when it provided the non-conforming bolts. Finally, Wayne contends that Cold Headed breached the implied warranties of merchantability and fitness for a particular purpose generally imposed in every contract for the sale of goods.[12]

Cold Headed's motion, on the other hand, tells a different story. Cold Headed contends that they did not breach the PPAP because Wayne could not provide an exact number of soft bolts to make such a determination, the soft bolts were not a "substantial factor contributing to Wayne's alleged damages[,]" and "[a]ny damages suffered by Wayne were not foreseeable" (ECF No. 63). As to the breach of warranty claims, Cold Headed's position is that they must be dismissed because Wayne did not provide a reasonable opportunity to cure the defective shipments and Cold Headed's conduct created no such warranties. (*Id.*).

## II.    Summary Judgment Standard

---

[11] Wayne's calculation for the $254,394.20 figure is as follows: $243,000 for its settlement with Dana plus $60,453.76 for Wayne's internal costs less $49,059.56 for Wayne's unpaid invoices for Cold Headed bolts. (ECF No. 72, ¶ 83-89).

[12] Wayne also moved for summary judgment on Cold Headed's counterclaim which will be addressed in the Court's discussion below.

Although state law provides the substantive law in diversity cases, federal law governs the summary judgment standard. *Maroules v. Jumbo, Inc.*, 452 F.3d 639, 645 (7th Cir. 2006). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In response, the non-moving party must marshal and present the Court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). A court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011).

The fact that the parties have filed cross-motions for summary judgment does not alter the standard. As the Court evaluates each side's motion, the Court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561-62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

### III.    Discussion

Wayne moves for summary judgment on four causes of action against Cold Headed: breach of contract, breach of express warranty, breach of the implied warranty of merchantability, and breach of the implied warranty of fitness for a particular purpose. Wayne contends and this Court agrees that if the Court grants summary judgment on any one of the claims, the Court need not evaluate any of the remaining claims because the damages sought for each are identical. (ECF No. 60 at 3). Wayne also argues that summary judgment is warranted on Cold Headed's counterclaims for breach of contract and, in the alternative, unjust enrichment. In opposition, Cold Headed moves for summary judgment *solely* on Wayne's claims. They urge this Court to find that they breached no part of the PPAP nor any alleged warranty by Wayne. Yet even when viewing the evidence in the light most favorable to Cold Headed, it is clear they supplied defective bolts in breach of their agreements with Wayne.

#### A.  Wayne's Breach of Contract Claim

For Wayne's breach of contract claim, the question is whether—given the severity ratings agreed to by the parties—Cold Headed's soft bolts breached the agreement. The parties do not dispute that Cold Headed agreed to produce bolts for Wayne at certain specifications. (*Id.* at ¶ 32-33). The heat-treating specifications are at issue here.

The UCC applies to the sale of goods. *See Insul-Mark Midwest v. Modern Materials*, 612 N.E.2d 550 (Ind. 1993) ("The sales chapter of the Indiana Uniform Commercial Code, Ind. Code Ann § 26-1-2, applies to transactions in goods."). As this is a contract for the sale of bolts, the UCC controls.

Indiana Code § 26-1-2-612, Indiana's version of the UCC, governs installment contracts. An installment contract "requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause 'each delivery is a separate contract' or its equivalent." Ind. Code § 26-1-2-612(1).

Cold Headed argues that there is a genuine issue of material fact on whether the purchase orders were part of the parties' contract. (ECF No. 71 at 3-4). Yet Cold Headed contradicts itself in its response to Wayne's Statement of Material Facts. (ECF No. 72). Where Wayne stated "[i]t was both Wayne and Cold Headed's understanding that the purchase orders formed a binding contract," Cold Headed responds that "[t]his fact is undisputed." (*Id.* at ¶ 36). Regardless, Cold Headed agrees that the terms of the PPAP govern. (ECF No. 63 at 10). The PPAP authorized the delivery of bolts in "separate lots to be separately accepted" via the purchase orders. (ECF No. 72, ¶ 34). It constitutes an installment contract, so § 612 controls.

Indiana's variation of the UCC provides remedies for buyers when the seller produces a non-conforming installment:

> The buyer may reject any instalment which is non-conforming if the non-conformity substantially impairs the value of that instalment and cannot be cured or if the non-conformity is a defect in the required documents; but if the non-conformity does not fall within subsection (3) and the seller gives adequate assurance of its cure the buyer must accept that instalment.

Ind. Code § 26-1-2-612(2). Moreover, where the seller's non-conformity substantially impairs the value of the whole contract, there is a breach of the entire agreement:

> Whenever non-conformity or default with respect to one (1) or more instalments substantially impairs the value of the whole contract there is a breach of the whole. But the aggrieved party reinstates the contract if he accepts a non-conforming instalment without seasonably notifying of cancellation or if he brings an action with respect only to past instalments or demands performance as to future instalments.

Ind. Code § 26-1-2-612(3). Section 612 makes clear that for Wayne to succeed on its breach of contract claim and justify the cancellation of the PPAP, it must prove that (1) Cold Headed's installment was non-conforming; and (2) that the non-conforming installment "substantially impair[ed] the value of the whole contract."

### 1. Batch 2C Was Non-conforming

In the PFMEA, Wayne and Cold Headed indisputably agreed to an occurrence level of 2. (ECF No. 62-14 at 6). At an occurrence level of 2, Wayne agreed to accept that between 1 in 100,000 to 1 in 100,000,000 bolts would be soft.[13] (ECF No. 62-9 at 2, ¶ 5). At that range and to succeed on its claim for breach, Wayne must prove that Cold Headed supplied over 90 soft bolts for the approximately 9,000,000 bolts supplied over the course of the parties' relationship.[14] (ECF No. 63 at 10). Keeping in mind that Batch 2C contained much less than the total number of bolts, Wayne has easily met this burden.

There is no explicit definition for "non-conforming" under Indiana's UCC provisions. But the definitions section provides that goods "are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract." Ind. Code § 26-1-2-106. Goods are thus non-conforming when they are not in accordance with the obligations under the contract.

---

[13] There is some dispute amongst the parties cross-motions as to what the appropriate range was. (ECF Nos. 72, 69). Wayne argues that the expected failure rate at an occurrence level of 2 is between 1 in 100,000 and 1 in 1,000,000 while Cold Headed argues the proper range is between 1 in 100,000 and 1 in 100,000,000. The Court does not need to address this discrepancy in reaching its ruling but, for the purposes of this Order, it analyzes breach under Cold Headed's proposed range. Yet the Court points out that, although Cold Headed provided this range in a response to interrogatories, their expert completely contradicted it when he confirmed that the acceptable range would be "anywhere from 1 out of 100,000 or 1 out of a million." (ECF Nos. 62-9 at 2, ¶ 5; 62-6 at 67:12-68:2).

[14] Cold Headed in its motion stated that "if the total number [of bolts] supplied was just 2 million bolts, Wayne would be required to produce evidence that Cold Headed produced over 200 soft bolts in order to establish breach of contract." (ECF No. 63 at 10).

It is true that Wayne agreed to assume the risk that Cold Headed would supply *some* soft bolts under the PPAP. But Wayne did not agree to assume the risk that Batch 2C would contain thousands of soft bolts. (ECF No. 72, ¶ 64-66). Cold Headed acknowledges in its own motion that to demonstrate breach, Wayne must show it was provided over 900 soft bolts. (ECF No 63 at 10). That figure reflects the entirety of the parties' relationship representing over 9,000,000 total bolts from 2016 to 2020, not just Batch 2C. (ECF No 72, ¶ 72). Wayne identified over 20,000 soft bolts from Batch 2C alone. At the very least, Batch 2C failed to conform to the terms of the PPAP.[15]

In opposition, Cold Headed contends that, under the PPAP process, there is an expectation the supplier will respond to the non-conformity by acting to correct it. (ECF No. 71 at 10). "In other words, a non-conformity does not breach the entire agreement between the parties." (*Id.*). Cold Headed bases this upon the testimony of its expert, where he states that the PPAP is a "living document." (ECF No 62-6 at 70). According to the expert, because the PPAP is a "living document," it can just be amended in the event of noncompliance and does not violate the contract. (*Id.*) Yet, the fact that the PPAP can be amended in the case of noncompliance does not mean Batch 2C conformed to the contract when the soft bolt issue arose. While Wayne identified thousands of soft bolts, Cold Headed produced no evidence that Batch 2C did conform. According to the PPAP in October 2020, Batch 2C was non-conforming.

### 2. The Non-conforming Installment Substantially Impaired the PPAP.

Indiana law on "substantial impairment" is sparse. *See Integrity Bio-Fuels, LLC v. Musket Corp.,* 2015 WL 1417849, at *12 (S.D. Ind Mar. 27, 2015). But Judge Barker in *Integrity Bio-*

---

[15] The Court notes that even if the PPAP constitutes the sole contract between the parties and, as Cold Headed claims in its motion (ECF No. 63 at 10), it was not an installment contract, the shipment would still be non-conforming. Cold Headed supplied bolts in Batch 2C that exceeded the 900 bolts allowed per 9,000,000 total bolts supplied.

*Fuels* provided a succinct interpretation from the Eastern District of Michigan of the "substantial impairment" standard:

> To establish substantial impairment of the value of an installment, the buyer must present objective evidence that with respect to its own needs, the value of the goods was substantially impaired. The determination as to whether the alleged breach constituted a substantial impairment of the entire contract is dependent upon the cumulative effect of [the breaching party's] performance under the contract, based on the totality of the circumstances . . . *Both of these questions regarding "substantial impairment" are questions of fact to be decided at trial by the fact-finder*.

*Id.* (internal citations and quotations omitted) (emphasis in original). Indeed, Judge Barker found that "[t]o determine whether based on [the plaintiff's] own needs, the value of [the goods] was substantially impaired by [the defendant's] breach based on totality of the circumstances necessarily requires the trier of fact to weigh the evidence, which is inappropriate on a motion for summary judgment." *Id.*

Although this authority cited by Cold Headed is well taken, the Court views this case as anomalous. While whether a non-conforming installment constitutes a substantial impairment is generally a question of fact, the cases cited by Cold Headed indicate that the party opposing summary judgment came forward with evidence to contradict the movant's claim. *See Integrity Bio-Fuels,* 2015 WL 1417849, at *12; *See also Cambridge Valley Machining, Inc. v. Hudson MFG LLC*, 470 F. Supp. 3d 230, 258-61 (N.D.N.Y. 2020).

Here, there is no contrary evidence for the Court to weigh. Cold Headed merely contends that substantial impairment is a material question of fact, but points to no evidence that would allow a fact finder to determine that a substantial impairment did not exist. *See Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("Once a party has made a properly-supported motion for summary judgment, the nonmoving party may not simply rest upon the pleadings but must instead

submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.' Fed. R. Civ. P. 56(e)."). If the nonmovant provides no evidence to rebut the movant's showing of substantial impairment, this Court is comfortable determining this issue as a matter of law.

The purpose of the substantial impairment requirement is "to preclude a party from cancelling a contract for trivial defects." *Hubbard v. UTZ Quality Foods*, 903 F. Supp. 444 (W.D.N.Y. 1995). "However, an installment agreement may require accurate conformity in quality as a condition to the right to acceptance if the need for such conformity is made clear either by express provision or by the circumstances." Ind. Code § 26-1-2-612, cmt. 4. In those cases, "the effect of the agreement is to define explicitly what amounts to substantial impairment of value impossible to cure." *Id.*

The PPAP required that the bolts comport to Metric Class 10.9 standards with hardening to be accomplished by heat treating the bolt to a surface hardness of 76-80 as measured by the 15-N Rockwell Superficial Hardness Scale. (ECF No. 72, ¶ 21). As stated above, the parties also agreed to the occurrence level of 2. (ECF No. 62-9 at 2). The effect of these exacting specifications was to define what amounts to a substantial impairment should Cold Headed's shipments not conform to the PPAP. The shipment here—Batch 2C—failed to meet these standards. *See Hubbard*, 903 F. Supp. at 451 ("[W]here the quality standards are set forth with great specificity, the failure to satisfy one of the specifically enumerated standards is a 'substantial impairment.'").

Wayne's properly supported motion shows the economic costs incurred by itself, Dana, and Dana's customers from yard holds, investigations, and testing. (ECF No. 60 at 7-9). So prevalent was the problem that Dana refused to accept Wayne retainer assemblies that used Cold Headed bolts. (*Id.* at 9). From the inception of the parties' relationship, Cold Headed knew the

whole purpose of the PPAP was for Wayne to satisfy its obligations to Dana. (*Id.*). The need for conformity was clear by the express provisions of the PPAP and from the circumstances. *See* Ind. Code § 26-1-2-612, cmt. 4. Once Dana refused to use assemblies with Cold Headed parts, the soft bolts constituted something a step farther than substantial impairment; Cold Headed's non-conforming installment rendered the PPAP useless for Wayne. It constitutes a breach of the whole.[16]

Cold Headed, attempting to circumvent this, contends that Wayne was required to give it an opportunity to cure the defective lot. This argument is derived from Ind. Code § 26-1-2-612(2) where it states, "but *if the non-conformity does not fall within subsection (3)* and the seller gives adequate assurance of its cure the buyer must accept that instalment." Ind. Code § 26-1-2-612(2) (emphasis added). Having determined that Cold Headed's defective installment falls within subsection (3), Cold Headed was not entitled to an opportunity to cure under subsection (2). Nor is there any evidence to support that Wayne accepted shipments after the full extent of the soft bolt issue was revealed.

Without a safe haven in § 612, Cold Headed places its emphasis on the notice requirements embodied in Ind. Code § 26-1-2-607 and Ind. Code § 26-1-2-608.[17] (ECF No. 76 5-9). If Wayne failed to notify Cold Headed of its breach, then it is precluded from any remedy. Ind. Code § 26-1-2-607(3). Likewise, if Wayne did not notify Cold Headed that it was revoking acceptance of

---

[16] Cold Headed also posits that "if Dana does not consider the noncompliance a substantial impairment of [Wayne's] PPAP with Dana, how can Wayne claim anything different regarding Cold Headed?" (ECF No. 71 at 10-11). Again, Cold Headed provided no authority to support this notion. Perhaps, Dana did not view Wayne at fault for the soft bolts which Wayne was not responsible for manufacturing. Nonetheless, Dana's and Wayne's PPAP is not at issue here and Cold Headed's argument is unavailing.

[17] Cold Headed also contends that Wayne waives their claim under Ind. Code § 26-1-2-612(3) by accepting "a non-conforming instalment without seasonably notifying of cancellation." (ECF No. 76 at 9). There are no facts suggesting that Wayne accepted a non-conforming installment after it discovered the full extent of the soft bolt issue. Whether Wayne properly notified Cold Headed of its breach and revoked acceptance will be analyzed under Ind. Code § 26-1-2-607 and Ind. Code § 26-1-2-608 respectively.

Batch 2C, then Wayne would be deemed to accept the non-conforming bolts. Ind. Code § 26-1-2-608(2).

The pertinent provision from Ind. Code § 26-1-2-607 is as follows:

(3) Where a tender has been accepted:
   (a) The buyer must, within a reasonable time after he discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy

Ind. Code § 26-1-2-607(3)(a). Timely notice is a condition precedent to recovery, but "the notice is sufficient if it simply informs the seller that there are some problems with the goods." *McClure Oil Corp. v. Murray Equip., Inc.,* 515 N.E.2d 546, 554 (Ind. Ct. App. 1987). Indeed, Indiana law follows a "lenient" standard for providing notice and the seller need only provide notice of "the factual circumstances sufficient for the seller to determine that the buyer has grounds for a claim of breach." *Paper Mfrs. Co. v. Rescuers Inc.,* 60 F. Supp. 2d 869, 881 (N.D. Ind. 1999).

Wayne met its obligation under Section 607. In October 2020, Wayne informed Cold Headed that Dana had "seen some [bolts] missing the heat treat process." (ECF No. 72, ¶ 47). Wayne also provided Cold Headed with a formal notice of noncompliance from itself and Dana. Both stated that the bolts were non-conforming because they failed the Rockwell hardness test. (*Id.* at ¶ 50-53). At the very least, Cold Headed knew the factual circumstances sufficient to determine whether Wayne had grounds for breach. *See Paper Mfrs. Co. v. Rescuers Inc.,* 60 F. Supp. 2d at 881.

Section 608's notice requirement is a greater hurdle. "[Revocation] is not effective until the buyer notifies the seller of it." Ind. Code § 26-1-2-608(2). "More than mere notification of breach is required." *Smith v. Nexus Rvs,* 468 F. Supp. 3d 1012, 1027 (N.D. Ind. 2020). "At minimum, the notice should clearly indicate that the buyers view their contractual obligations as

16

having been terminated because of the product's non-conformity and that the buyers wish to return the product." *Id.* "Merely complaining about the quality of goods, without more, does not adequately inform the seller the buyer has revoked." *De Voe Chevrolet-Cadillac, Inc. v. Cartwright,* 526 N.E.2d 1237, 1240 (Ind. Ct. App. 1988). "Nonwritten notice or equivocal notice of revocation does not fare well in the courts." *Id.*

The evidence here shows that, with respect to the defective lot, Wayne viewed their contractual obligations as terminated because of the bolt's non-conformity. *See Smith,* 468 F. Supp. 3d at 1240. Although the timeline of events is difficult to discern from the pleadings, Wayne has unequivocally revoked its acceptance. Wayne informed Cold Headed via email of the soft bolts after Dana discovered them on October 8, 2020. (ECF No. 62-18). On October 11, 2020, Dana issued its official notice to Wayne which pointed out the soft bolt problem and signified breach on Wayne's part. (ECF No. 3 at 20). Immediately[18] after receiving the notification, Wayne supplied Cold Headed with a copy of Dana's notice as well as providing their own notice of noncompliance to Cold Headed. (ECF No. 72, ¶ 51-52). Wayne's *written* notice stated, "[w]e do not want [Cold Headed] to be surprised concerning the magnitude of costs" that Cold Headed's non-conforming bolts caused. *See* Ind. Code § 26-1-2-608, cmt. 5 ("The content of the notice under subsection (2) is to be determined in this case as in others by considerations of good faith, prevention of surprise, and reasonable adjustment."). Following that statement, the notice stated "[t]his letter constitutes Wayne Manufacturing's official notice that Cold Headed's supply of defective bolts constitutes a liability." (ECF No. 3 at 22).

---

[18] Cold Headed disputed the use of the term immediately in their response to Wayne's Statement of Material Facts on the grounds that "immediately" is subjective and subject to different interpretations. However, they provide no evidence, exhibit, or citations to the record showing that the notice was not supplied "immediately" under anybody's interpretation. (ECF No. 72, ¶ 51-52). Wayne, on the other hand, supported their assertion with affidavits from its president and vice president as well as the documents themselves. (ECF Nos. 62-10, 62-11).

Cold Headed does not dispute that Wayne cancelled the contract. (ECF No. 72, ¶ 70). Indeed, no more Cold Headed bolts were shipped after October 12, 2020. (ECF No. 62-10 at 4). Wayne was forced to undertake extensive investigations to reveal how pervasive the problem actually was. (ECF Nos. 62-10, 62-24). Once the extent of the problem revealed itself, Wayne refused to pay for any outstanding invoices for the materials identified which could no longer be used. (ECF No. 62-12 at 7). Wayne, as an act of good faith, informed Cold Headed that it still possessed all the materials associated with the invoices and internal scrap. (*Id*). Cold Headed refused to pick them up. These acts, embodied in writing, unequivocally "indicate that [Wayne] viewed their contractual obligations as having been terminated because of the [bolts] nonconformity and that [they] wish to return the product." *See Smith,* 468 F. Supp. 3d at 1240.

Cold Headed's last contention is that Wayne cannot prove that Cold Headed supplied the defective bolts. Yet Wayne provided three citations supporting that the defective bolts were Cold Headed's— including its second suppliers packing list which confirms that the suspect batch contained only Cold Headed bolts. (ECF No. 72, ¶ 58). In response, Cold Headed merely asserts that it "is without sufficient knowledge to form a basis or opinion as to this assertion." (*Id.*). After the close of discovery and without citation to any evidence to rebut that assertion, Cold Headed's response is tantamount to an admission. *See Lyon Fin. Servs., Inc. v. AKB Enterprises, Inc*, 2010 WL 4386841, *2 (N.D. Ill. Oct. 28, 2010) ("While a response that a party lacks sufficient information to form a response may be appropriate for an answer to a complaint, it is not a proper response to a statement of material facts.").

"Summary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoting *Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir.2003)). Wayne has put up. Cold Headed did not. Accordingly, Wayne's motion for

summary judgment on its breach of contract claim is GRANTED. Cold-Headed's cross-motion for summary judgment is DENIED as to Wayne's claim for breach of contract. Having granted Wayne summary judgment on its breach of contract claim, the Court need not address the remaining claims for breach of warranty because, as discussed below, the damages sought are identical.

### B. Cold Headed's Counterclaims

Wayne also moves for summary judgment on Cold Headed's counterclaims for breach of contract and unjust enrichment. For many of the same reasons discussed above, Wayne's cross-motion for summary judgment on Cold-Headed's counterclaims must be granted.

Cold Headed believes that Wayne breached the PPAP too for bolts ordered but not used by Wayne. (ECF No. 16). In the alternative, Cold Headed makes a claim for unjust enrichment. Yet "[w]hen the rights of the parties are controlled by an express contract, recovery cannot be based on a theory implied in law." *Kohl's Indiana, L.P. v. Owens*, 979 N.E.2d 159, 168 (Ind. Ct. App. 2012). The parties do not dispute that the PPAP and the purchase orders control (ECF No. 72, ¶ 36; ECF No. 76 at 1), so Cold Headed cannot pursue a claim for unjust enrichment. Wayne's summary judgment motion as to unjust enrichment is GRANTED.

As for Cold Headed's claim that Wayne also breached the PPAP, this argument goes nowhere. Once a non-conforming installment impairs the installment contract as a whole, the aggrieved party has no duty to provide an opportunity to the breaching party to cure defects in future installments. *Design Plus Store Fixtures, Inc. v. Citro Corp.*, 508 S.E.2d 825, 830 (N.C. Ct. App. 1998); *See also* Ind. Code § 26-1-2-612, cmt. 6. And a substantial impairment of the whole gives the aggrieved party an "immediate right to cancel the entire contract." *Design Plus,* 508 S.E.2d at 830.

For the reasons above, Cold Headed's non-conforming installment is a breach of the whole and Wayne complied with the notice requirements to revoke acceptance of the non-conforming lot. Wayne, therefore, had an immediate right to cancel the entirety of the parties' agreement and reject all future installments. Wayne did not breach the PPAP or any part thereof. This is all the more true considering Wayne has held all unused bolts and scrap at their facility, but Cold Headed has not chosen to retrieve them. *See* Ind. Code § 26-1-2-604 ("[I]f the seller gives no instructions within a reasonable time after notification of rejection, the buyer may store the rejected goods for the seller's account"). Wayne's motion for summary judgment on Cold Headed's breach of contract counterclaim is GRANTED.

### C.  Damages

Having found that Cold Headed breached their agreements with Wayne, this Court's final task is to determine whether a material question of fact exists with respect to damages. Wayne seeks $254,394.20 for the settlement with Dana and its internal costs associated with the breach. (ECF No. 60 at 8-9). Cold Headed believes that these damages were not foreseeable at the time of contracting. (ECF No. 63 at 12-14). To the contrary, Wayne is entitled to be paid for its costs.

Two provisions of Indiana's UCC are at play here. The first is Ind. Code § 26-1-2-714. If a buyer gives proper notice, they "may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." Ind Code § 26-1-2-714(1). Incidental and consequential damages under Ind. Code § 26-1-2-715 are also available. Ind Code § 26-1-2-714(3); *See also Michiana Mack, Inc. v. Allendale Rural Fire Prot. Dist.,* 428 N.E.2d 1367, 1373 (Ind. Ct. App. 1981) ("If a buyer accepts goods, discovers such to be non-conforming and properly rejects or revokes acceptance of the goods, then those expenses which are 'incidental' to or a 'consequence' of that entire transaction

may rightfully be recovered. The expenses incurred by the buyer are correctly considered a result of the seller's breach.")

Ind. Code § 26-1-2-715 provides that "[i]ncidental damages from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." Ind. Code § 26-1-2-715(1). Consequential damages include "[a]ny loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." Ind. Code § 26-1-2-715(2).

Determining whether Wayne's requested damages ($254,394.20) are appropriate requires the Court analyze how Wayne reached such a figure. The first source of Wayne's damages comes from its settlement with Dana amounting to $243,000.00. (ECF No. 62-25). The second source is Wayne's internal costs from sorting, testing, and scrapping Cold Headed's defective bolts— amounting to $60,453.76. (ECF No. 62-12). These costs would total $303,453.76, but Wayne gave credit for Cold Headed's unpaid invoices amounting to $49,059.56 for bolts which could no longer be used. (*Id.*).

Cold Headed's primary contention with respect to Wayne's settlement is that they were not responsible for any noncompliance between Dana and Wayne. (ECF No. 71 at 12-15). Their position is that the damages were not foreseeable at the time of contracting because they were not a party to Dana and Wayne's contract. (*Id.*). Yet it is undisputed that Cold Headed knew the purpose of the PPAP was for Wayne to satisfy its contract with Dana. Cold Headed manufactured the bolts based off a "Dana print." (ECF No. 72, ¶ 20). And Cold Headed knew that the bolts would

be incorporated into Wayne's retainer assemblies to be placed into Dana's axles. The axles were then incorporated into vehicles produced by Dana's customer. Despite all this knowledge, Cold Headed does not believe that supplying thousands of defective bolts to be incorporated into vehicles could result in such costs. Simply put, Cold Headed should have known at the time of contracting that supplying thousands of bolts would result in yard holds and other costs down the line. As the party responsible for supplying the bolts, these damages can be fairly attributed to Cold Headed. For the same reasons, they are not absolved of liability simply because it was not a party to the settlement agreement between Dana and Wayne.[19] The settlement was foreseeable and Cold Headed could not produce evidence to the contrary. It is covered by Ind. Code § 26-1-2-715(2).

As for Wayne's internal costs, Cold Headed alleges that they are not responsible because it offered to cure the nonconformity. Even still, once Cold Headed's non-conforming installment substantially impaired the whole PPAP, Wayne owed no duty to offer a chance to cure. They possessed and exercised an "immediate right to cancel the entire contract." *See Design Plus,* 508 S.E.2d at 830. Given that Cold Headed has no right to cure under the circumstances, Wayne can recover for Cold Headed's nonconformity "the loss resulting in the ordinary course of events from the seller's breach." *See* Ind Code § 26-1-2-714(1). Wayne provided evidence that $60,453.76 were their costs incurred for sorting, testing, and scrapping Cold Headed's soft bolts. (ECF No. 62-12 at 2, 7). The costs resulted from the ordinary course of events from Cold Headed's breach.

---

[19] Cold Headed, in its response to Wayne's Statement of Material Facts, disputed whether $243,000 was reasonable in light of the breach. (ECF No. 72, ¶ 77-81). To each of Wayne's assertions regarding whether the settlement was reasonable and what the resultant exposure could have been, Cold Headed again responds that it is without sufficient knowledge to form a basis or opinion and provides no citation to any evidence. (*Id.*) Meanwhile, Wayne provided sworn testimony from several persons indicating that exposure could be "extremely high," "in the area of 2 million dollars," and "between a minimum of $300,000 to a maximum of $3 million." (*Id.*). After the close of discovery, these answers are insufficient. *See Lyon,* 2010 WL 4386841, at *2.

Again, Cold Headed provided no evidence to combat that figure. Thus, Wayne is entitled to these costs covered by Ind. Code § 26-1-2-714.

Wayne should be compensated to the extent of the benefit it lost but does not attempt to place itself in a better position than before Cold Headed's breach. *See Potts v. Offutt*, 481 N.E.2d 429, 434 (Ind. Ct. App. 1985) ("A party injured by a breach of contract should be compensated to the extent of the benefit lost, but should not be placed in a position better than before the breach."). Although their damages exceed $300,000, they provided Cold Headed with credit for unpaid invoices from prior installments. Wayne only seeks the benefit of their bargain and no more. This Court agrees that Wayne is entitled to the $254,394.20 it seeks.

## IV.    Conclusion

For these reasons, Defendant's Motion for Summary Judgment (ECF No. 63) is DENIED. Summary judgment is GRANTED in favor of Plaintiff and against Defendant as to Plaintiff's claim for breach of contract and Defendant's counterclaim. The CLERK is DIRECTED to enter judgment in favor of Wayne Manufacturing, LLC, and against Defendant in the amount of $254,394.20.

SO ORDERED on September 26, 2023.

s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT